DowNey, Judge,
delivered the opinion oí the court:
During the year 1918, as a war activity, the United States was maintaining in St. Paul, Minnesota, a training school for air-service mechanics. It was located in the Overland Building, and the students were quartered therein and in tents on the premises. In September of that year there were twelve or fifteen hundred students quartered in tents, and about this time an epidemic of influenza broke out and spread among the students to such an extent that about six hundred were afflicted. Housing accommodations were entirely inadequate under favorable circumstances and with such an epidemic raging, the congestion and the character of the accommodations were such that it could not be properly handled and suppressed.
Under these circumstances Major Weaver, who was in command of the school, and Captain Gosling, who was supply officer and charged with the duty of procuring supplies and quarters, accompanied by several officers from Washington, who were presumably there for that purpose, began an inspection of buildings which might be procured or taken over for use as quarters, and having inspected a large manufacturing building belonging to the plaintiff company they found it “ exceptionally desirable.”
Negotiations were entered into between the plaintiff’s officers on the one hand and Major Weaver and Captain Gosling on the other, resulting in a proposition being submitted by the plaintiff, which, as to proposed rental charges, was thereafter considerably reduced, and a verbal agreement was thereupon reached between them for the renting of the building. This agreement, in brief, involved the payment of rental at the rate of 25 cents per square foot per year for the entire building, the reimbursing to the plaintiff of any expense incurred in moving its property out of the building and in returning it thereto at the expiration of the tenancy, with provisions as to the extension and the termination of the tenancy, with other formal matter not here material.
The terms agreed upon were incorporated in a written lease prepared by Captain Gosling, or in his office under his direction, and by him presented to the plaintiff’s proper *114 officers for signature and signed by them, after proper authority granted by the directors, and this lease was sent on to Washington for signature on behalf of the United States, the plaintiff being given to understand that it would be returned signed within a short time, probably within a week.
The officers of 'the training school thereupon took possession of the building under the lease. Officers from Washington had participated in the inspection and approval of the building, and there is apparent from the record no expectation upon the part of the officers of the school other than that the lease would be signed when it reached Washington. The plaintiff’s property then in the building, after but a day’s notice, was loaded rather indiscriminately and without care into trucks and hauled and dumped into a building which plaintiff had succeeded in hastily renting for that purpose, some damage thereto resulting.
The armistice soon followed, and about the last of December the United States, by Captain Gosling, notified the plaintiff that possession of the building would be surrendered on or before January 31, 1919, and it was surrendered on or before that date. It was not, so far as appears from the record, until after the termination of the tenancy by reason of the 80-day notice and the surrender of the building to the plaintiff that plaintiff was notified that the lease signed by it and under which it had surrendered possession of its building, had not been and would not be signed by the United States.
It does not appear from the record why this lease was sent to Washington for signature when it is conclusively shown that it was one of the duties of Captain Gosling, as supply officer, to procure quarters and when in this matter he acted, in addition to his own authority, under the direction of the commanding officer and in an emergency. However, the reason for the procedure, probably a good one, is not material. The circumstances are of some interest as bearing on the good faith of the supply officer as the Government’s authorized rental agent and of the plaintiff in surrendering the possession of its building under a lease which it had every reason to assume would be properly executed by the United States, in connection with which it is to be noted that a three- *115 months’ tenancy expired without any notice within that time to the plaintiff that the lease would not be executed, although possession under the lease must have been well known in the Washington office during all that time, and also, that the tenancy was in fact terminated by just such a notice as was provided for in the lease.
The plaintiff sues for the amount of rent provided for in the lease (less an amount already paid) which it also proves was the fair rental value of the property, expense of returning its property to the building, a work it- was directed to undertake for itself on assurance that it would be reimbursed, damages to its property in moving and some loss occasioned by the termination of a profitable existent tenancy in a part of its building at the time it was taken over by the United States. The last of these items is not strenuously urged and there is apparent no basis upon which it can be predicated. Neither does it seem to us possible upon any theory to permit a recovery for the alleged damages done to plaintiff’s property in connection with its removal.
There remains the question of the recovery of the rental either at the rate provided in the lease as agreed upon between the parties or at its fair value as shown and found and the expense to which plaintiff was put in returning its property to its building at the expiration of the tenancy. And it may here be noted that the findings of fact fix the rental value of the property at the same amount provided in the lease, in addition to the cost to the plaintiff of removing and returning its property, also provided for therein. It is not necessary, therefore, to discuss in detail any one of the two or three different theories under which the plaintiff might and we believe is entitled to recover, or to discriminate with nicety between the different theories and their applicability.
The plaintiff relies upon the Dent Act, 40 Stat. 1272. The defendant’s position is that the lease not having been “ reduced to writing and signed by the contracting parties with their names at the end thereof,” as required by section 3744, ^Revised Statutes, “ the question involved in this case is the rental value of the property.” We might leave the case where the defendant has thus put it, for the result *116 is apparent. But it is our understanding that the purpose of the Dent Act in the main was to provide relief from the infirmities under which parties dealing with the Government found themselves by reason of the fact that their contracts had not been formally executed as required by the statute cited. And the conditions of such relief recited in the first section of the act seem to be broad enough to cover this case.
But, aside from this feature of the case, this contract was fully performed and, as said, so iierformed before any notice to the plaintiff that it would not be executed as required by law. It has frequently been held that the invalidity of a contract is immaterial after it has been performed.
And if it could be successfully contended that relief is not to be found in the Dent Act or upon the contract because it was fully performed, there would remain the right, as upon an implied contract, to recover the fair rental value of the property. It would seem that no further discussion was necessary.
Upon any one of these theories the plaintiff is entitled to judgment in the sum of $4,145.18.
Graham, Judge; Hat, Judge; Booth, Judge, and Campbell, Chief Justice, concur.